wIN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL J. BEAUTYMAN and<br>MICHAEL J. BEAUTYMAN FAMILY<br>LIMITED PARTNERSHIP, | : <br> : <br> : <br> : | CIVIL ACTION |
| Plaintiffs, | : | No. 17-5804 |
| v. | : | |
| GENERAL INSURANCE COMPANY OF<br>AMERICA, | : <br> : <br> : | |
| Defendant/Cross-Claimant, | : | |
| DAVID LAURENT, a/k/a, DAVID J.<br>LEHARVEO, | : <br> : <br> : | |
| Defendant/Cross-Defendant. | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                              **JUNE 11, 2019**

Presently before the Court is Defendant General Insurance Company of America's ("GICA") Motion for Summary Judgment and Plaintiffs Michael J. Beautyman ("Beautyman") and Michael J. Beautyman Family Limited Partnership's (the "Partnership") (collectively, "Plaintiffs") Response in Opposition. For the reasons noted below, GICA's Motion is granted.

## I.    BACKGROUND

Plaintiffs own a condominium unit located in the Residences of Two Liberty Place (the "Premises"), located in center city Philadelphia. (Def.'s Statement of Undisputed Facts ("SUF") ¶ 9.) The Premises was purchased from the original developer in 2008. (*Id.*) The Premises is a condominium which is governed by a condominium association created by the Declaration of The Residences at Two Liberty Place, A Condominium (the "Condominium Association"). (*Id.*

¶ 10.) The Condominium Association is subject to bylaws which provide for the governance of the Condominium Association, pursuant to the Pennsylvania Condominium Act. (*Id.* ¶ 11.) The Condominium Association can levy a special assessment for non-budgeted expenses against individual unit owners. (*Id.* ¶ 13.) Between 2013 and 2016, Beautyman either occupied the premises himself or used it for short term rentals. (*Id.* ¶¶ 15–16.)

On or about February 22, 2016, Beautyman leased the Premises to David Laurent ("Laurent") for a term beginning March 1, 2016 and ending February 28, 2017. (*Id.* ¶ 17.) On December 20, 2016, Laurent allegedly damaged a desk located in the common area of the Condominium Building by using a hammer to destroy a cell phone(s) and then damaged another desk in the lobby. (*Id.* ¶ 18.) Plaintiffs further allege that beginning sometime on or prior to December 20, 2016, Laurent damaged certain portions of the Premises and damaged certain items of real property located in the Premises. (*Id.* ¶ 22.)

After this incident, Laurent was hospitalized, and it was determined by both Beautyman and the Condominium Association that it was necessary to have Laurent precluded from returning to the Premises. (*Id.* ¶ 19.) To that effect, Beautyman and the Condominium Association initiated court proceedings to have Laurent evicted and precluded from returning to the Premises. (*Id.* ¶ 20.) However, Laurent was allowed back on the Premises soon after he was released from the hospital. (*Id.* ¶ 21.) Laurent changed the locks, refused to allow Beautyman to enter, and only vacated the Premises around the time that the lease term was complete. (*Id.* ¶ 23.) Beautyman alleges that Laurent continued to cause damage to the Premises and Beautyman's personal property during this time. (*Id.*) Beautyman was actively engaged in all necessary legal proceedings to evict Laurent prior to the lease term ending. (*Id.*)

Plaintiffs' claim damages totaling $231,736.34.  (*Id.* ¶ 25.)  Plaintiffs broke down this amount across five categories: (1) "Damage which occurred prior to December 21, 2016 which was discovered on December 21, 2016"; (2) "Damage which occurred between December 25, 2016 and February 27, 2017"; (3) "Damages to Betterments and Improvements"; (4) "Special Assessments"; and (5) "Legal and Clerical Expenses to date."  (*Id.*)  Plaintiffs' answers to interrogatories breaks down the alleged damages even further:

> A. Damage which occurred prior to December 21, 2016 which was discovered on December 21, 2016:
> J. McAleer Painting, $5,000.00;
> Wooden brandy and crystal container, $1,000.00;
> Glass vase, $3,000.00;
> English decanters, $2,000.00;
> Mirror w/horse scene by Turner & Hurst, $5,000.00;
> Steuben and English cut crystal glasses, $5,000.00;
> Winter Harbor Yacht Club trophies (four), $1,500.00;
> Microwave, $540.00;
> Refrigerator, $10,500.00;
> The Mahogany glass-front china cabinet, $7,500.00.
>
> B. Damage which occurred between December 25, 2016 and February 27, 2017:
> Petrof piano, $7,500.00;
> Metal end table – contemporary, $2,500.00;
> Coffee table – contemporary, $2,000.00;
> Sectional sofa, $8,500.00;
> Cable box, $1,000.00;
> Bedroom carpets, $12,800.00;
> Metal framed L-shaped work station, $500.00;
> Bedroom lamp, $200.00;
> English writing desk, $5,000.00;
> Comforter and bedding, $950.00
> Brita water pitcher, $25.00;
> Ab coaster exercise machine, $400.00;
> Stainless steel waste basket, $50.00;
> The remote-controlled blinds, $9,844.00.
>
> C. Damages to Betterments and Improvements:
> Safeco estimate, $23,881.33;
> Repainting by Certa Pro Painters of the Main Line;
> $6,486.00;

3

     Keystone floor products – carpet, $8,080.00;
     Hong Nguyen, $4,320.00 – General Contractor.

  D.  Special Assessment: $24,527.68

  E.  Legal and Clerical Expenses to date:
     Beautyman Alvstad, LLP, $77,428.65;
     Eliza Gresh, $1,252.00;
     Albert Lupin, $560.00.

(Def.'s Mot. Summ. J., Ex. E ("Interrogatory Answers"), 6–8.)

  On January 24, 2017, through counsel for the Condominium Association, Beautyman was sent correspondence giving notice of the misconduct of Laurent. (SUF ¶ 28.) The notice indicated that Beautyman had violated the by-laws and demanded reimbursement for damage to a marble counter caused by Laurent and legal fees and costs in protecting the condominium. (*Id.*) On March 16, 2017, a Special Assessment was issued to Beautyman noting that: (1) the "Unit owners are fully responsible for the acts of the occupants of their Units, including landlord unit owner for his tenant"; (2) "[o]n December 20, 2016, Laurent verbally and physically threatened/harassed the staff and residents and damages [sic] property of the association, the common areas of the condominium, and/or condominium unit."; and (3) "[t]he association expended $8,736.00 for security services, $125 to change the locks, $15,666.68 in legal fees" for a total "in the amount of $24,527.68." (*Id.* ¶ 29.)

  Beautyman held a "Quality-Plus Condominium Policy" on the Premises issued by GICA during the period of February 28, 2016, through February 28, 2017 (the "Policy"). (*Id.* ¶ 30.) The Policy details coverage of damages caused by seventeen types of "perils." (*Id.* ¶ 37 (quoting Def.'s Mot. Summ. J., Ex. I, Quality-Plus Condominium Policy ("Policy")).) At the time of the December 20, 2016 incident, the Policy did not cover personal property at a location rented to others. (*Id.* ¶ 43.) However, on February 8, 2017, Beautyman requested and received additional

coverage through GICA, changing "the property and liability coverage part to include coverage for losses related to the insured premises while it is being rented to others." (*Id.* ¶ 53 (citing Def.'s Mot. Summ. J., Ex. I, Option K – Condominium Rental to Others ("Option K")).)

On February 13, 2017, Stephen Alvstad ("Alvstad"), Beautyman's law partner, sent correspondence to GICA advising that a property damage claim was being made and that the exact date of loss and the full extent of damage was not known. (*Id.* ¶ 56.) On March 8, 2017, GICA inspected the Premises and advised that the applicable limit for the damage to the condominium was $10,760 and would be paid to Plaintiff. (*Id.* ¶ 58.) Plaintiff disagreed with GICA's evaluation of the claim. (*Id.* ¶ 59.) GICA responded on September 21, 2017, advising that it would pay additional living expenses totaling $13,600 and provided reasons for denying Plaintiff's other claims. (*Id.* ¶ 60.)

Unsatisfied, Plaintiff initiated this suit on December 4, 2017, in the Philadelphia Court of Common Pleas claiming GICA acted in bad faith and that the ambiguity of the Policy's described coverage should be interpreted in favor of Plaintiff's claim. The case was removed to this Court on December 28, 2017. GICA filed this Motion for Summary Judgment on January 1, 2019.

## II.     LEGAL STANDARD

### A.     Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) states that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998) (quoting Liberty Lobby, 477 U.S. at 255).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362–63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. *Tziatzios v. United States*, 164 F.R.D. 410, 411–12 (E.D. Pa. 1996). If the court determines there are no genuine disputes of material fact, then summary judgment will be granted. *Celotex*, 477 U.S. at 322.

**B.     Insurance Contract Interpretation**

Under Pennsylvania law, the interpretation of an insurance contract regarding the existence or the non-existence of coverage is generally performed by the court. *See Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007). "The purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance

policy." *401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005). When the language of the policy is clear and unambiguous, the Court must give effect to that language; however, when a provision in a policy is ambiguous the policy is to be construed in favor of the insured and against the insurer, as the insurer drafts the policy and controls coverage. *Id.* A policy is construed in favor of the insured in order to further the contract's prime purpose of indemnification. *Id.* "Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999). "[I]n determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a contract, do not assume that its language was chosen carelessly." *401 Fourth St., Inc.*, 879 A.2d at 171. A court construes words of common usage in an insurance policy "in their natural, plain and ordinary use." *Madison Constr. Co.*, 735 A.2d at 108. A court may inform its understanding of terms by consulting their dictionary definitions. *Id.*

### III. DISCUSSION

GICA moves for summary judgment on three grounds: (1) it asserts Plaintiffs' claims for property damage are not covered under the Policy's Property Coverage section; (2) it argues that the Policy's Liability Coverage section does not apply to the Condominium Association's Special Assessment or Beautyman's attorney's fees because the costs were not incurred during the defense of a claim or suit, but rather for effectuating an eviction; and (3) it had a reasonable basis to deny Beautyman's claim and did not act in bad faith. We are persuaded by GICA's arguments and, for the reasons explained below, grant its Motion for Summary Judgment.

7

**A. Damages to Premises were not Covered under the Property Coverage Section of the Policy because Premises was Tenant-Occupied**

1. Damages Caused by a Tenant Clearly Excluded from Policy Coverage

It is undisputed that Beautyman and Laurent entered into a lease agreement effective March 1, 2016, through February 28, 2017. At the time that this agreement was executed, and throughout the vast majority of the lease term, the Premises was insured by GICA under the Policy. GICA argues that the personal property coverage of the Policy, was in effect on December 20, 2017, did not cover the damages claimed by Plaintiffs. (Def.'s Mem. Law in Supp. Mot. Summ. J. 18–19.) According to the Policy, it does not cover "[p]roperty in a location regularly rented or held for rental to others by any insured; but this exclusion does not apply to property of an insured in a sleeping room rented to others by an insured on the residence premises." (Policy 2.) As Beautyman had rented the Premises to Laurent at the time, GICA asserts that the coverage did not apply. (Def.'s Mem. Law in Supp. Mot. Summ. J. 19.)

Contrarily, Plaintiffs focus solely on the latter part of the exclusion, in an attempt to frame the damages as property in a "sleeping room." (Pls.' Resp. in Opp'n Mot. Summ. J. 16–17 ("[GICA] apparently has ignored the exception to this exclusion, which would provide coverage for Plaintiffs' personal property within a sleeping room rented to others.").) However, Plaintiffs do not elaborate on their interpretation of a sleeping room or how they would apply the term to this case. Moreover, a sleeping room is more or less a term of art, commonly, though not exclusively, used to refer to hotel, motel, or subleased rooms.

A plain reading of the term "sleeping room," as well as its use in the Policy, indicates two important considerations. First, it must be a subsection of the larger premises. *Cf.* Matthews Municipal Ordinances § 37:24.70 ("As to each rental unit, a specification of the exact number of sleeping rooms contained in the rental unit and the exact number of sleeping accommodations

contained in each of the sleeping rooms, identifying each sleeping room specifically by number and location within the apartment or dwelling . . . ."). The Policy states: "[a] sleeping room rented to others . . . *on the residence premises*." (Policy 2.) By distinguishing a sleeping room as a location on a premises, the Policy clearly does not consider a sleeping room to be the Premises as a whole. *See 401 Fourth St., Inc.*, 879 A.2d at 171 (giving effect to clear and unambiguous language).

Second, as its name implies, a sleeping room is typically used for sleeping. *Cf.* Matthews Municipal Ordinances § 37:83 ("Sleeping room: Any room used by people for their daily or nightly sleep, including bedrooms and including any room not designed as a bedroom but in fact used for sleeping."); *see also* 4 Phila. Code and Home Rule Charter PM-202 ("Bedroom. Any room or space used or intended to be used for sleeping purposes in either a dwelling or sleeping unit."). Nowhere in their briefing do Plaintiffs argue that this $6,800.00/mo. condominium is a sleeping room. (Def.'s Mot. Summ. J., Ex. C ("Lease Agreement") 1–2 (defining rented property as "Unit #4010 in The Residences at Two Liberty Place, 50 S. 16th St., Philadelphia, PA 19102").) Likewise, many of the items included in Plaintiffs' list of damages are not commonly found in a sleeping room. (Interrogatory Answers 6–8 (listing damaged items such as a: microwave, refrigerator, "mahogany glass-front china cabinet," Petrof piano, coffee table, sectional sofa, etc.).) Any attempt to conform all or part of the damages as property within a sleeping room would not only fail on a practical level, as it is unclear from Plaintiffs' list which property was specifically in a sleeping room, but would be contrary to the basic intent of the Policy.

The Policy was clearly intended to provide coverage of the Premises, as a whole. The Policy clearly foreclosed coverage in the event Plaintiffs rented out the Premises, as was the case

here. It is unreasonable to infer that GICA intended to provide coverage in the event Plaintiffs rented out the entire Premises simply because the third-party tenant would also utilize a sleeping room. *See 401 Fourth St., Inc.*, 879 A.2d at 171. Consequently, the Policy did not provide coverage for the property damage caused by Laurent, because it was tenant-occupied.

    2.    <u>Beautyman's Policy Change is Ineffective</u>

On February 8, 2017, following the advice of Michael Dion ("Dion"), Beautyman's third-party insurance broker, that the Premises was not fully covered under the Policy because it was tenant-occupied, Beautyman added additional coverage, titled "Option K – Condominium Rental to Others." (SUF ¶¶ 52–53; Def.'s Mot. Dismiss, Ex. B ("Beautyman Dep.") 118–19.) Option K amended the Policy to remove the provision discussed above that denies coverage when the Premises are rented by the insured to a third-party tenant. (Option K ("Item 7. of Personal Property We Do Not Cover is deleted.").) According to the Quality-Plus Condominium Policy Declarations, Option K cost an additional premium of $146.60 per month. (Def.'s Mot. Summ. J., Ex. I ("February 8, 2017 Policy Declarations").)

GICA argues two grounds for why the February addition of Option K is unavailing to Plaintiffs, both of which are compelling. First, GICA argues that Plaintiffs cannot prove what amount of damages occurred following the switch from owner-occupied insurance to tenant-occupied insurance. (Def.'s Mem. Law in Supp. Mot. Summ. J. 19–20.) In his interrogatory answers, Beautyman lists all property damages under two main categories: "Damages which occurred prior to December 21, 2016 which was discovered on December 21, 2016" and "Damages which occurred between December 25, 2016 and February 27, 2017." (Interrogatory Answers 7–8.) GICA contends that, in order for Plaintiffs' to claim damages under Option K, they would be required to list which damages occurred after the amendment was enacted on

10

February 8, 2017. (Def.'s Mem. Law in Supp. Mot. Summ. J. 18.) However, it is impossible to tell from the list in Beautyman's interrogatory answers what, if any, property damage occurred after February 8, 2017.

Moreover, it is impossible for Plaintiffs to know on which date any particular damage occurred. As Plaintiffs readily admit, following the December 20, 2016 incident, Laurent was allowed to reenter the Premises, where he proceeded to "change the locks to the Unit, depriving [Beautyman] of access to his own condo." (Pls.' Resp. in Opp'n Mot. Summ. J. 4.) Beautyman was not able to enter the Premises until after Laurent had vacated the Premises at the expiration of the lease on February 28, 2017. (*Id.*) It was then that Beautyman "learned that additional damages had been caused to the Premises as well as his personal property within the Unit." (*Id.*) Therefore, Plaintiffs cannot break apart his claim for damages into a specific time frame that occurred solely after Beautyman purchased the additional policy coverage.

In its second argument, GICA asserts that Option K should be voided on the grounds that the "policy change was clearly made in an attempt to deceive GICA in regard to the presence of an active claim which was not covered under the policy as it was issued prior to the policy change." (Def.'s Mem. Law in Supp. Mot. Summ. J. 24.) GICA contends that Beautyman "had a tenant in the Premises for almost an entire year," "was aware of a potential insurance claim caused by the tenant," and "knew or should have known that the tenant was actively causing damage to the real and personal property at the premises." (*Id.* at 20.)

Citing the Policy, GICA notes that Beautyman was required to "give immediate notice" to GICA "in case of a loss to which [the Policy] may apply." (*Id.* (quoting Policy 7).) The Policy is "void if any insured has, before or after a loss: (a) *intentionally concealed* or misrepresented any material fact or circumstance; or (b) made false statements or engaged in

11

fraudulent conduct relating to this insurance; with the intent to deceive." (*Id.* (quoting Policy 17) (emphasis added).) However, Beautyman did not provide GICA immediate notice of any damage that occurred on December 21, 2016. (*Id.* at 21.) Instead, Beautyman added additional tenant-occupied coverage on February 8, 2017, then waited an additional week to file his claim on February 13, 2017. (*Id.*)

Plaintiffs do not address this argument in their Response in Opposition. Beautyman only briefly addresses why he waited until after he added Option K to file the claim for damages, including those stemming from the December 2016 incident, in his deposition. (Beautyman Dep. 119 ("[In January 2017] Mr. Alvstad called the agent to report damages . . . . The change in the policy was based upon the fact that the agent said, Hey, you forgot to change this back over when you brought the tenant in.").) However, in an email sent by Alvstad to Dion on February 8, 2017, Alvstad stated: "*As of this date*, we are notifying you that there is a tenant in the property insured by the [Policy]. Thus, please change the [P]olicy from an owner-occupied policy to a tenant-occupied policy." (Def.'s Mot. Summ. J., Ex. J ("Alvstad Email") (emphasis added).)

This email is, at best, misleading. Laurent had been living on the Premises for nearly a year at the time that this email was sent. The email makes no mention that Laurent had allegedly caused several thousands of dollars in damage to the Premises a month and a half earlier. (Interrogatory Answers, 6–8.) Furthermore, the email continues to request that the Policy be amended to "increase the liability limit on the [P]olicy to $1,000,000" without mentioning any potential claim, which Alvstad and Beautyman knew or should have been aware. (Alvstad Email.)

We agree with GICA that Alvstad and Beautyman concealed and mischaracterized important information when they requested Option K be added to the Policy. Therefore, Option K is invalid under the terms of the Policy and does not provide Plaintiffs relief from the Property Coverage section's exclusion for premises rented to third-party tenants.

3. The Cause of the Property Loss is Immaterial

Relatedly, for these reasons, we need not decide whether Plaintiffs' claimed damages should be considered a cause of one of the named perils covered by the Policy. Plaintiffs argue that the property damages are a loss caused by one of the seventeen named perils under the "Personal Property Losses We Cover" provision of the Policy, namely "Vandalism or Malicious Mischief." (Pls.' Resp. in Opp'n Mot. Summ. J. 8–11 (quoting Policy 2–3).) However, because the Policy does not cover "[p]roperty in a location regularly rented or held for rental to others by any insured," it is immaterial whether the cause of the property loss was one of the seventeen perils.

For these reasons, Plaintiffs' claim against GICA under the Property Coverage section of the Policy is dismissed with prejudice.

**B. Liability Coverage does not Apply to Plaintiffs' Claim**

Plaintiffs next assert that the Policy's Liability and Loss Assessment Coverages apply to the Special Assessment Fees imposed on Beautyman by the Condominium Association. (Pls.' Resp. Mot. Summ. J. 11–14 (citing *id.*, Ex. B ("Special Assessment")).) The Special Assessment "encompassed [the Condominium Association's] Attorney's Fees and related expenses, which were necessary to evict [Laurent] and preclude him from the Premises after the damage he caused on or around December 20, 2016." (*Id.* at 11 (citing Special Assessment).) Beautyman

13

was obligated to pay the amount of $24,527.68,[1] which included attorney's fees, security guard services, and a locksmith. (*Id.* at 13–14 (citing Special Assessment).) Plaintiffs contend that GICA improperly denied coverage of the Special Assessment, despite its obligations under the Policy's Personal Liability coverage and Loss Assessment coverage. (*Id.* at 11–14.)

1. Liability Coverage Section

    a. *Liability Coverage does not Apply as No Claim was Brought Against Beautyman*

In response to this claim, GICA contends that none of the fees or costs listed in the Special Assessment or "Legal and Clerical Expenses" interrogatory answer ("LCE") claimed by Plaintiffs are covered under the Policy. (Def.'s Mem. Law in Supp. Mot. Summ. J. 14–18.) With respect to the portions of Plaintiffs' claim for reimbursement for attorney's fees included in the Special Assessment or LCE, GICA highlights that the Liability Coverage section of the Policy applies "[i]f a claim is made or a suit is brought *against any Insured* for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies." (*Id.* at 15 (emphasis added) (quoting Policy 11).) Under this provision, GICA is required to "(1) pay up to our limit of liability for the damages for which the insured is legally liable; and (2) *provide a defense at our expense* by counsel of our choice even if the allegations are groundless false or fraudulent." (Policy 11 (emphasis added).)

---

[1] The Court notes that the Special Assessment attached to Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment is in the amount of $24,527.68. (Special Assessment.) Initially, Plaintiffs note that this amount includes "attorney's fees and related expenses" incurred by the Condominium Association "to evict [Laurent]." (Pls.' Resp. in Opp'n Mot. Summ. J. 11.) However, later in their briefing, Plaintiffs refer to a special assessment levied against Beautyman by the Condominium Association for the following amounts: "$23,065.18 for legal fees; $8,736.00 for security guard services; and $125 for a locksmith." (*Id.* at 13.) Only a few paragraphs later, Plaintiffs claim that the special assessment fee was $23,065.18 and "included amounts for: legal fees; security guard services; and a locksmith." (*Id.* at 14.)

     Although, as we explain in more detail below, the Special Assessment is not covered under the Policy, thus making the actual amount immaterial to our analysis, the Court was never provided with a clear breakdown of the Special Assessment fee. Therefore, for the purposes of this Memorandum Opinion, we use the amount of $24,527.68 listed in the Special Assessment, attached to Plaintiff's response, and consider the costs to include attorney's fees incurred by the Condominium Association, security guard services, and a locksmith.

14

However, GICA correctly argues that this provision applies only when a claim is made *against an insured*. (Def.'s Mem. Law in Supp. Mot. Summ. J. 15–16 ("Laurent did not bring suit against [Beautyman], but rather, Beautyman and the Condominium Association initiated suit against [Laurent] to have him evicted from the premises.").) Here, the Condominium Association's attorney's fees included in the Special Assessment and the LCE incurred by Plaintiffs by "challenging the Special Assessment, . . . evicting [Laurent], and . . . submitting claims for insurance reimbursement," (SUF ¶¶ 26–27), are not "defenses" against liability, but rather costs incurred during an eviction proceeding. (*Id.* at 16.) Moreover, Plaintiffs were not found liable because of any action, but rather were required to pay the Special Assessment fee under the bylaws and regulations of the Condominium Association. (Special Assessment ("[A]s authorized by the powers and duties given it by the provisions of [Pennsylvania laws] . . . the Bylaws of Residences at Two Liberty Place Condominium Association, Inc. . . . and the Rules and Regulations . . . , the [Condominium Association] has levied a Special Assessment . . . .").) Therefore, by the plain language of the provision, the Policy does not cover the attorney's fees included in the Special Assessment.

    b. *Special Assessment was a Result of Eviction Proceedings not Covered under the Policy*

GICA further contends that the Policy does not cover these costs, as they were incurred during an eviction proceeding. (Def.'s Mem. Law in Supp. Mot. Summ. J. 16.) GICA argues that because the attorney's fees, security guard services, and locksmith costs relate to eviction, the Special Assessment and LCE are not covered by the provision's bodily injury or property damage requirement. (*Id.* (quoting Policy 11) ("If a claim is made or a suit is brought against any Insured for damages because of bodily injury or property damage . . . .").) In response, Plaintiffs argue that, although these costs were incurred for the purposes of eviction, they are

covered under the Policy because they stem from Laurent's initial destruction of property. (Pl.'s Resp. in Opp'n Mot. Summ. J. 14 ("Each of these expenses was solely the result of the need to evict [Laurent] from the Premises following the damages he caused to the personal property of Plaintiff's and the lobby of [the Condominium Association].").)

The Court acknowledges that Beautyman and the Condominium Association decided to evict Laurent because of Laurent's actions on December 20, 2016. (SUF ¶¶ 19–20 ("After this incident, . . . it was determined by both Beautyman and the Condominium Association that it was necessary to have [Laurent] precluded from returning to the premises. Beautyman and the Condominium Association initiated court proceedings to have [Laurent] evicted and precluded from returning to the premises.").) However, Plaintiffs fail to identify how any of the expenses in the Special Assessment or LCE would not have been incurred if Plaintiffs decided to evict Laurent on other, non-property damage grounds. For example, the same costs would have been incurred during the subsequent eviction proceedings if Laurent failed to pay rent or otherwise breached the lease agreement he signed with Beautyman. (Def.'s Mot. Summ. J., Ex. C, Residential Lease, 10 (identifying grounds for eviction and outlining eviction costs).) Simply because an eviction results from an incident of property damage does not make the costs incurred during that process "damages" resulting from the initial property damage.

            *c.    Liability Coverage does not Extend to Business Pursuits or the Rental of the Premises*

Finally, GICA argues that, even if the costs incurred in the Special Assessment or LCE were of the type covered by the Liability Coverage section, "there is a clear exclusion for personal liability 'arising out of business pursuits of any Insured or the rental or holding for rental any part of any premises by an insured.'" (*Id.* (quoting Policy 11.)) As we discussed above, it is undisputed that Beautyman rented out the Premises to Laurent, despite this exclusion

16

of liability coverage. Therefore, a plain reading of the Policy finds that the Liability Coverage section does not apply to the property damage caused by Laurent. *See 401 Fourth St., Inc.*, 879 A.2d at 171.

Importantly, Option K, which Beautyman attempted to add over a month after the December 20, 2016 incident specifically removes the exclusion from liability for the rental of the Premises. (Option K ("Under Liability Losses We Do Not Cover, 1.b. [the exclusion of liability coverage] does not apply to the renting or holding for rental of the residence premises.").) However, as we have already voided Beautyman's addition of Option K to the Policy, it is unavailable to Plaintiffs here. Likewise, the Special Assessment and LCE costs were incurred well before Beautyman attempted to add Option K on February 8, 2017. (*Compare* Alvstad Email (dating addition of Option K on February 8, 2017); *with* Interrogatory Answers 13 ("Filed Landlord/Tenant Eviction Complaint in the Philadelphia Municipal Court January 6, 2017 . . . three days after [Condominium Association] filed a Petition for Injunction/TRO barring Laurent from the building . . . .") *and* Pls.' Resp. in Opp'n Mot. Summ. J., Ex. A, Nora Meyers Email (indicating General Manager Nora Meyers was changing the locks on December 20, 2016, immediately following the incident).)

Therefore, Plaintiffs' claims concerning the Special Assessment and LCE are not covered by the Policy's Liability Coverage Section. Accordingly, the claims are dismissed with prejudice.

2. Loss Assessment Coverage Provision

As for Plaintiffs' claim that the Special Assessment is covered under the Policy's Loss Assessment provision, GICA argues that in order for the "coverage to be triggered, the terms and

17

conditions of either the Property Coverage Part or Liability Coverage Part must be met." (Def.'s Mem. Law in Supp. Mot. Summ. J. 17.) The Loss Assessment provision states:

> We agree to pay your share of any loss assessment charged during the policy period against you by the association of property owners up to $1,000 when the assessment is made as a result of:
>
> 1. each direct loss to the property owned by all members collectively, caused by a personal property losses [sic] we cover, other than earthquake or volcanic eruption, under Section I [Property Coverages] of this policy;
>
> 2. each occurrence to which Section II [Liability Coverages] of this policy would apply.

(Policy 17.)

As we discussed above, the Special Assessment was not the result of a claim or suit made against Beautyman, included costs related to the eviction of Laurent, and was excluded because the Premises was rented out by Beautyman. Thus, the Special Assessment does not fall under the coverage provided by the Liability Coverage section. Likewise, the Special Assessment does not include any costs for direct losses to "property owned by all members collectively" caused by a personal property loss covered under the Property Coverages provision. (Pls.' Resp. in Opp'n Mot. Summ. J. 13; Special Assessment.) As the Special Assessment was not a result of either of these sections, the Loss Assessment Coverage provision does not apply.

For these reasons, Plaintiffs' claim under the Loss Assessment provision is dismissed with prejudice.

## C. There is no Claim for Bad Faith

To prove a claim of bad faith, "the plaintiff must show that the defendant did not have a reasonable basis for denying benefits under the policy and that defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim." *See Terletsky v. Prudential Prop.*

*and Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. 1994) (citing *Am. Franklin Life Ins. Co. v. Galati*, 776 F. Supp. 1054, 1064 (E.D. Pa. 1991)). "Bad faith on the part of an insurer must be proved through clear and convincing evidence that 'the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim.'" (Pls.' Resp. in Opp'n Mot. Summ. J. 15 (quoting *MGA Ins. Co. v. Bakos*, 699 A.2d 751, 754 (Pa. Super. 1997)).) However, a "reasonable basis is all that is required to defeat a claim of bad faith." *See J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004).

As we have discussed at length above, not only did GICA have a reasonable basis for denying Plaintiffs' claims, Beautyman's pertinent claims are not covered by the Policy. Therefore, Plaintiffs' bad faith claim is dismissed with prejudice.

## IV. CONCLUSION

For these reasons, GICA's Motion for Summary Judgment is granted. Plaintiffs' claim concerning property damage caused by Laurent under the Property Coverages provision of the Policy, claims for fees concerning the Special Assessment under the Liability Coverages and Loss Assessment provisions, and claim of bad faith against GICA are dismissed with prejudice.

An appropriate Order follows.